**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BRUCE P.,

               Claimant,

       v.

ANDREW SAUL, Commissioner
of Social Security,

            Respondent.

No. 18 CV 7478

Magistrate Judge Jeffrey T. Gilbert

**MEMORANDUM OPINION AND ORDER**

Claimant Bruce P.[1] ("Claimant") seeks review of the final decision of Respondent Andrew Saul,[2] Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 6]. The parties have filed cross-motions for summary judgment [ECF Nos. 15, 19] pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons discussed below, Claimant's Motion for Summary Judgment [ECF No. 15] is denied, and the Commissioner's Motion [ECF No. 19] is granted.

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Commissioner Saul as the named defendant.

## PROCEDURAL HISTORY

On October 8, 2013, Claimant filed a Title II application for DIB alleging disability beginning on December 10, 2011. (R. 131, 143, 365-72). His claim was denied initially and upon reconsideration, after which Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R. 191-95, 198-201, 203-11). On August 31, 2015, Claimant appeared and testified at a hearing before ALJ Jessica Inouye. (R. 35-85, 144-61). ALJ Inouye also heard testimony on that date from vocational expert ("VE") Brian Harmon and Claimant's cousin, James Kissel. (R. 78-85). ALJ Inouye subsequently denied Claimant's claim for DIB but the case was remanded by the Appeals Council on August 16, 2016 for further consideration of the opinions of Susan Entenberg, a vocational expert hired by Claimant's counsel. (R. 144-65). ALJ Inouye again denied Claimant's claim on June 30, 2017, and the Appeals Council again remanded. (R. 166-85, 186-90). Claimant's case was assigned to a new ALJ and proceeded to another hearing before ALJ Cynthia M. Bretthauer on May 15, 2018. (R. 86-123). At that hearing, the ALJ heard testimony from Claimant and Kari Seaver, an impartial VE. (R. 86-123).

On May 31, 2018, ALJ Bretthauer denied Claimant's claim for DIB. (R. 12-34). In finding Claimant not disabled, the ALJ followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. § 416.920(a). At step one, the ALJ found that Claimant did not engage in substantial gainful activity during the period from his alleged disability onset date of December 10, 2011 through his date last insured of December 31, 2015, as Claimant's earning record reflected only very minimal earnings in 2012 and no earnings between 2013 and 2015. (R. 17).

At step two, the ALJ found that Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c) and 416.920(c). (R. 17-18). Specifically,

Claimant suffered from obesity, peripheral neuropathy, coronary artery disease (CAD), hypertension, and diabetes mellitus (20 CFR 404.1520(c)). (R. 17). The above-noted severe impairments, according to the ALJ, significantly limit Claimant's ability to perform basic work activities. (R. 17). The ALJ also took note of the fact that Claimant had a non-severe impairment – obstructive sleep apnea – that was medically determinable but did not more than minimally affect Claimant's ability to perform basic work activities. (R. 18).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18). The ALJ noted that Claimant did not meet or medically equal the criteria of listing 4.04, the applicable listing section for coronary artery disease, nor did he meet the requirements of listing 11.14 regarding peripheral neuropathy. (R. 18-19). The ALJ further considered listing 4.00(H)(1) as it related to Claimant's hypertension but determined that there was no evidence in the record of a "specific body system so affected as to meet or equal a listing in the instant case." (R. 19). The ALJ nevertheless specified that she would consider the impact of Claimant's hypertension, even though it did not meet the severity of any listing, when assessing Claimant's residual functional capacity ("RFC"). (R. 18). Finally, the ALJ considered listing 9.00 and SSR 14-2p as it pertained to Claimant's diabetes, as well as SSR 02-1p and Claimant's obesity, and determined that none of the listings or regulations were satisfied based on the record. (R. 18-19).

The ALJ then found Claimant had the RFC,[3] through Claimant's date last insured, to:

"perform light work as defined in 20 CFR 404.1567(b), except he could do: no climbing of ladders, ropes and scaffolds; occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling; and should have avoided concentrated exposure to

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

unprotected heights, moving and hazardous machinery, and temperature extremes." (R. 19).[4]

Based on this RFC, the ALJ found at step four that Claimant had past relevant work as an appliance sales representative. (R. 25). After weighing Claimant's testimony, earning records, and other evidence, including the VE's testimony, the ALJ concluded that Claimant was capable of returning to that previous work either as generally performed in the national economy or as actually performed by Claimant. (R. 25-26). Claimant's residual functional capacity did not preclude him from meeting the physical demands of his prior work, according to the ALJ. (R. 25-26).

Finally, at step five, the ALJ did not determine whether, considering Claimant's age, education, past work experience, and residual functional capacity, he is capable of performing any other work within the national economy because she had concluded that Claimant was capable of doing his past relevant work. (R. 26). The ALJ then found Claimant was not disabled under the Act. (R. 26). The Appeals Council declined to review the matter on October 12, 2018 (R. 1-3), making the ALJ's decision the final decision of the Commissioner and, therefore, reviewable by this Court. 42 U.S.C. § 405(g); *see, e.g., Smith v. Berryhill,* 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v.*

---

[4] As discussed later in the body of this Memorandum Opinion and Order, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Social Security Ruling 83-10; *see also* 20 C.F.R. § 404.1567(b).

*Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also, Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Biestek,* 139 S. Ct. at 1154; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotations omitted). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

### I. The ALJ's Assessment of Claimant's Treating Physician's Opinion

Plaintiff first contends that the ALJ did not adequately explain her decision to afford the opinion of Claimant's treating physician, Dr. Gary Kaufman, M.D., little weight and that her decision to discount Dr. Kaufman's opinion was clear error. [ECF No. 15] at 3-10. To the contrary, as discussed below, the ALJ at least "minimally articulated" her reasons for discounting Dr.

Kaufman's opinion and provided evidence from medical and other sources in support of her reasoning. She therefore did not err in her evaluation of Claimant's treating physician's opinion, as explained further below.

The ALJ must "minimally articulate" her reasons for crediting or rejecting evidence of disability. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)). Claimant filed his disability claims before March 27, 2017, meaning that the ALJ was required to evaluate the treating physician opinion in two steps. At the first step, the ALJ must give a treating source's opinion controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2); *see Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007). Then, at the second step, if the ALJ decides a treating physician's opinion should not be given controlling weight, she must determine what weight to afford the opinion in light of the checklist factors in 20 C.F.R. § 404.1527(c)(2). *Scrogham v. Colvin,* 765 F.3d 685, 697 (7th Cir. 2014). These factors include the nature of the examining relationship, the length of the treating relationship, whether the medical evidence supports the opinion, whether the opinion is consistent with the record, the physician's specialization, and any other factors that relate to the opinion. *Schmidt*, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); *see also, Latkowski v. Barnhart*, 93 F. App'x 963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart,* 93 F. App'x 939, 942 (7th Cir. 2004).

Although an ALJ must consider all the factors set forth in 20 C.F.R. § 404.1527(c), she need not expressly discuss each factor in her written opinion. *Schreiber v. Colvin,* 519 Fed. App'x 951, 959 (7th Cir. 2013) (rejecting claimant's argument that the ALJ erred by not specifically addressing each factor). As long as she otherwise explains why the treating physician's opinion is not supported by the medical record and is inconsistent with the rest of the record, that usually will suffice. *Henke v. Astrue*, 498 F. App'x 636, 640 n. 3 (7th Cir. 2012) ("The ALJ did not explicitly weigh every factor [in 20 C.F.R. § 404.1527] while discussing her decision to reject [the treating physician's] reports, but she did note the lack of medical evidence supporting [the treating physician's] opinion…and its inconsistency with the rest of the record…This is enough")*; see also, Loveless v. Colvin,* 810 F.3d 502, 507 (7th Cir. 2016) ("treating physician's opinion is entitled to controlling weight unless it is 'inconsistent with the other substantial evidence.'"). Ultimately, the weight accorded to a treating physician's opinion must balance all the circumstances and recognize that while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining benefits…[and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006) (internal citations omitted).

In April of 2014, Dr. Kaufman, Claimant's treating physician, provided a medical source statement in which he assessed Claimant's work-related limitations. (R. 1137-40). He reaffirmed this statement in August of 2015 and noted that Claimant continued to suffer from obesity and lower extremity neuropathy at that time. (R. 1136). In his opinion, Dr. Kaufman stated that in a workplace setting, Claimant could lift and carry only ten pounds occasionally, could sit and stand/walk for less than two hours total in an eight-hour workday, required a one-hour break every

hour or more frequently, would be off-task 25% or more of the workday, and would miss more than four days per month due to his impairments. (R. 1137-40).

In determining that Dr. Kaufman's opinion was not entitled to controlling weight, the ALJ initially explained that:

> "The claimant's primary care physician, Gary Kaufman, M.D., provided a medical source statement in April 2014, which he later reaffirmed in August 2015 (13F;14F), in which he assesses disabling limitations, due to obesity and lower extremity neuropathy. For example, the doctor opined that the claimant was able to sit and stand/walk less than 2 hours in an 8-hour workday, would require unscheduled breaks lasting an hour every hour or more frequently, would be "off task" 25 percent or more of the time, and would likely be absent more than 4 days per month as a result of his impairments or treatment.
>
> Despite the extreme limitations assessed by Dr. Kaufman, all of the claimant's primary care exams during the relevant period were within normal limits, except for rare acute issues. Although the doctor attributes the claimant's limitations in part due to peripheral neuropathy, none of his clinical exams reflect decreased sensation and the record does not contain any EMG/NCV testing to objectively support the diagnosis of neuropathy." (R. 21).

The ALJ then proceeded to outline the evidence in the record – including objective medical evidence, subjective testimony from Claimant, and Claimant's activities of daily living – that did not support the substance of Dr. Kaufman's opinion. After this detailed review of the record, the ALJ concluded that:

> "As outlined above, the claimant's primary care physician, Dr. Kaufman, assessed that the claimant would be unable to sustain even sedentary work (13F; 14F). The undersigned has given Dr. Kaufman's opinions little weight because he is not a specialist and his assessments are inconsistent with the objective medical findings, the treatment the doctor has undertaken, the claimant's own reported statements, and the claimant's activities of daily living. For example, the doctor opined that the claimant was able to sit and stand/walk less than 2 hours in an 8-hour workday. Yet during his consultative exam in February 2014 the claimant did not report or evidence any difficulties in sitting (5F). As to the claimant's stand/walk abilities, Dr. Kaufman noted in the same report that the claimant could walk 6 to 8 blocks at a time (14F/3). There is also a notation in August 2012 that the claimant "walks regularly" (7F). Also, as discussed above, the claimant admitted that he had just stopped working his last job as an appliance sales representative, where he was standing 3 to 4 hours at a time. The doctor also does not provide any explanation for his assessment that the claimant would require unscheduled breaks lasting an hour every hour or more frequently, would be "off task" 25 percent or more of the time, and would likely be absent

more than 4 days per month as a result of his impairments or treatment. The doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor did not specifically address this weakness. Furthermore, the very conservative course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported. Overall, the doctors' opinions contrast sharply with the other evidence of record, which renders it less persuasive." (R. 24-25).

As evidenced by her analysis above, the ALJ was clearly aware of each substantive factor she needed to consider under 20 C.F.R. § 404.1527 when she determined that Dr. Kaufman's opinion was inconsistent with substantial evidence in the record. And she in fact addressed each one. First, she acknowledged that Dr. Kaufman was Claimant's treating physician and that he completed regular primary care exams throughout Claimant's relevant period of disability. (R. 21). But the nature and length of Dr. Kaufman's treatment relationship did not, according to the ALJ, override the other factors in deciding what weight to give his opinion. The ALJ noted that Dr. Kaufman was not a specialist, (R. 24), and that the medical and other evidence in the record did not support Dr. Kaufman's conclusions. (R. 21-22, 24-25).[5]

Looking first at the medical evidence, the ALJ correctly noted that Dr. Kaufman's opinion did not square with his own treatment notes during the relevant period, particularly as to the limiting effects of Claimant's peripheral neuropathy. All of Dr. Kaufman's primary care examinations during his period of alleged disability were within normal limits according to the ALJ – a stark contrast, the ALJ emphasized, to the "extreme limitations assessed by Dr. Kaufman" and Claimant's ability to walk, sit, or stand during the workday. (R. 21). Although Dr. Kaufman

---

[5] Claimant argues the ALJ was wrong to discount Dr. Kaufman's opinion because he was not a specialist particularly since she credited the opinions of the agency physicians who also were not specialists. The ALJ, however, did not rely heavily on the fact that Dr. Kaufman was not a specialist in discounting his opinion. Rather, the focus of her analysis and decision was that the record evidence did not support the limitations assessed by Dr. Kaufman as necessary for Claimant to be able to sustain full-time work. (R. 24) ("The undersigned has given Dr. Kaufman's opinion little weight because he is not a specialist and his assessments are inconsistent with the objective medical findings, the treatment the doctor has undertaken, claimant's own reported statements, and the claimant's activities of daily living.").

opined that Claimant could not sit and stand/walk more than two hours in a workday, the ALJ accurately noted that Dr. Kaufman's own records indicated that Claimant "walks regularly" and that he could walk six to eight blocks at a time, which takes him about thirty minutes. (R. 24, 967, 1139). Moreover, four months before Dr. Kaufman's first medical source statement in April 2014, Claimant said in his work history report that he worked as an electronics and appliance salesman and was walking or standing for eight hours a day, and sitting for two hours a day, five days a week) (R. 445). Claimant testified that he would have continued working in that job had he not been terminated. (R. 23-24, 96). Further, the medical records of Claimant's physician visits were often devoid of any objective medical findings or subjective complaints regarding pain in Claimant's legs or feet. (R. 729, 701-710, 711-717, 885, 961, 998); see, e.g., Parker v. Astrue, 597 F.3d 920, 923 (7th Cir. 2010) ("And if the presence of objective indicators…makes a claim more plausible, their absence makes it less so."). Dr. Kaufman's records therefore support the ALJ's conclusion that Claimant was able to sit, stand, or walk for longer durations than the limitations incorporated into Dr. Kaufman's opinion.

Also of concern to the ALJ was Dr. Kaufman's failure to provide any support for his determination that Claimant would be off-task for at least 25% of the day and absent for four days a month. Dr. Kaufman did not explain – nor could the ALJ determine – what "impairments" or limitations Dr. Kaufman was referring to as the basis for this conclusion and whether the off-task or absentee determination was a result of Claimant's obesity, peripheral neuropathy, hypertension, or some combination of Claimant's diagnoses or impairments. Therefore, because it is well-established that an ALJ may give less weight to an opinion that is unsupported by objective evidence, Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010), the ALJ was right to consider the

degree to which the objective evidence contradicted Dr. Kaufman's opinions as one factor in her analysis.

The ALJ also explained that she was discounting Dr. Kaufman's opinion because the degree of disability he identified for Claimant was inconsistent with and contradicted by the doctor's own course of treatment throughout the relevant period. For example, although Dr. Kaufman diagnosed Claimant as having peripheral neuropathy, he never ordered EMG or NCV testing to validate that diagnosis and did not order a neurology consult. (R. 21, 103-104). The ALJ noted this fact as support for her statement that Dr. Kaufman lacked "objective[] support [for] the diagnosis of neuropathy," which was not improper in the course of evaluating the weight to be given to Dr. Kaufman's opinion under the circumstances. (R. 21). Claimant's complaints of pain and other medical needs were exclusively addressed through routine medical check-ups, medication for the pain as needed, and with conservative courses of treatment like compression stockings and straps for Claimant's feet. (R. 22-23, 102, 1070-71). Although the podiatrist diagnosed Claimant with plantar facial fibromatosis and indicated peripheral neuropathy, Claimant refused an injection to his foot on his second visit and never sought any further podiatry or other care after those two visits. (R. 21, 1069-72). Dr. Kaufman recommended that Claimant exercise and lose weight – a recommendation that was echoed by Claimant's cardiologist and pulmonologist. All three noted that Claimant would see improvement in his pain and other physical symptoms if he pursued an exercise plan, such as stationary biking. (R. 599, 606, 658, 682, 704, 708, 714-15, 735, 738, 753, 835, 905, 908-09, 998, 1024-27, 1078, 1279, 1288).

There is additional evidence in the record that Claimant's foot pain was controlled with medication. Albeit after Claimant's date last insured, in July of 2016, Dr. Kaufman noted that Claimant had been taking Lyrica, which appeared to be more effective in addressing Claimant's

foot pain than Gabapentin, a medication he switched to because of his insurance coverage. (R. 1229, 1240, 1244). As of the May 2018 hearing, Claimant continued to take Lyrica and said it was effective in relieving his pain, although it did not completely alleviate it. (R. 118). Dr. Aliaga, who conducted a consultative examination on Claimant in February 2014 (discussed below) also noted that Claimant's "[d]iabetes mellitus appears to be well controlled with insulin and medication," and that Claimant only suffered from "[m]ild neuropathy possibly associated with diabetes involving mainly the distal lower extremities" at the time of the examination. (R. 946). Based on the above, the ALJ was not patently wrong to conclude that Dr. Kaufman's extreme assessment of Claimant's abilities was inconsistent with his own medical notes and the level of treatment he provided to Claimant.

Turning now to the other medical evidence of record, there are three other significant sources documenting Claimant's limitations beyond Dr. Kaufman's treatment notes. And the ALJ considered all three when she evaluated the weight to be given Dr. Kaufman's opinions. As noted above, Dr. Jorge Aliaga, M.D., conducted an internal medicine consultative evaluation in February of 2014. (R. 943-46). As it pertains to Claimant's neuropathy, Dr. Aliaga noted that Claimant subjectively complained of neuropathic pain in both feet, which started about four years ago. (R. 943). When he examined Claimant, Dr. Aliaga noted that Claimant had no clubbing, cyanosis, or edema in his extremities, as well as no calf tenderness, no venous varicosities, and no skin breakdown or ulcerations. (R. 945). Claimant had no limitations noted in his lower extremities, and specifically had full active range of motion at the hips, knees, and ankles bilaterally. (R. 945). Dr. Aliaga also noted no joint deformity, effusion, or acute inflammation, and further emphasized that he had a normal standing and sitting posture. (R. 945). His gait was "wide-based due to obesity but otherwise normal without the need or use of an assistive device." (R. 945). Finally, Dr. Aliaga

documented that Claimant had no obvious difficulty getting on and off the exam table, no difficulty with heel-walk, toe-walk or tandem gait, and that squatting and arising was done without difficulty. (R. 945). So too was weight bearing and single leg balance done bilaterally without difficulty. (R. 945). And although Claimant had some "patchy inconsistency in the sensation in and around the ankles," Dr. Aliaga noted it was not consistent. (R. 946).

Ultimately, it was Dr. Aliaga's clinical impression that Claimant's diabetes mellitus was "well controlled with insulin and medication" and that Claimant only suffered from "[m]ild neuropathy possibly associated with diabetes involving mainly the distal lower extremities" at that time. (R. 946). This directly conflicts with Dr. Kaufman's more extreme opinion of Claimant's limitations, which he offered only a few months after Dr. Aliaga examined Claimant. Thus, there is support in the record for the ALJ's apparent suspicion that Claimant's long-time treating physician was shading his opinion, or "bend[ing] over backwards," in favor of a finding that that Claimant was wholly disabled when that may not have been the case. *Hofslien*, 439 F.3d at 377.[6]

The opinions of two separate reviewing physicians – Dr. Richard Bilinsky, M.D., and Dr. Vidya Madala, M.D. – also support the ALJ's conclusion that Dr. Kaufman's opinion was entitled to less weight, particularly concerning Claimant's walk, sit, and stand limitations. *Flener v. Barnhart,* 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation."). Dr. Bilinsky and Dr. Madala reviewed all the medical evidence available to them and contributed opinions regarding Claimant's limitations in March and October of 2014, respectively. (R. 124-30, 132-42). Dr. Bilinsky noted that although Claimant was diagnosed with peripheral neuropathy,

---

[6] As discussed later in this Memorandum Opinion and Order, although Dr. Kaufman opined that Claimant could sit, stand, or walk for no more than two hours in an eight-hour workday, (R. 1137-40), that was decidedly less work activity than Claimant himself said at times he was capable of accomplishing. (R. 96, 108, 445, 653-54).

his reported "ability to stand, walk, and climb stairs are not credible, as there is no supporting evidence for these allegations in the medical records." (R. 127-28). Dr. Madala similarly acknowledged Claimant's diagnosis of peripheral neuropathy, as well as his subjective complaints of numbness and pain in both feet, (R. 133, 137), but also concluded that the severity of Claimant's limitations in standing, walking, or climbing stairs was not substantiated by the medical evidence. (R. 138-40). Both medical opinions directly contradict the severity of impairment Dr. Kaufman found, and the ALJ was correct to consider this evidence in evaluating Dr. Kaufman's opinion.

Claimant argues that neither of the state agency reviewing physicians saw Dr. Kaufman's opinion and those consulting opinions should be disregarded for that reason. It is true that Dr. Bilinsky rendered his opinion before Dr. Kaufman provided his first medical source statement in April 2014 and therefore cannot have considered it. And though Dr. Madala gave her opinion in October 2014 – after Dr. Kaufman's initial medical source statement but before he reaffirmed it in August 2015 (R. 1136-40) – she appears not to have considered Dr. Kaufman's opinion at all in her analysis. But both reviewing physicians saw Dr. Kaufman's treatment records and based their opinions on those records. Therefore, this is not a situation in which the state agency medical consultants did not see Claimant's medical records as of the time they provided their opinions.[7]

Further, Claimant's argument that the state agency physicians's failure to consider Dr. Kaufman's opinion now constitutes reversible error is somewhat undercut by the record from

---

[7] While Claimant cites several Seventh Circuit cases in support of his argument that "because none of the state agency physicians reviewed his opinion, the ALJ reversibly erred in failing to submit this evidence to appropriate medical scrutiny," those cases in fact only chastise state agency physicians who failed to review the entire objective medical record, not the broader universe of subjective medical opinions. [ECF No. 15] at 5 (citing *Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014); *Childress v. Colvin*, 845 F.3d 789, 791-92 (7th Cir. 2017); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016)). This is not a distinction without a difference. Claimant cites no case in which a court threw out a state agency physician's opinion because that doctor had not reviewed a treating doctor's opinion, as opposed to the claimant's longitudinal medical records. Nor has the Court located such a decision through its own research.

Claimant's hearings in 2015 and 2018. At the hearing in 2015, ALJ Inouye and Claimant's counsel acknowledged that the state agency physicians did not see or rely upon Dr. Kaufman's opinion in their analyses, but that did not affect the admissibility of those opinions. (R. 39). Claimant's counsel noted that "[w]e always ask that the State Agency – the A exhibits be afforded less weight than the treating physician's reports, however they're admissible." (R. 39). And both ALJ Inouye and Claimant's counsel in 2015 agreed the record was complete despite these omissions by the state agency physicians. (R. 39). Claimant's attorney at the 2018 hearing, whose firm continues to represent Claimant in this proceeding, similarly confirmed that the record was complete despite the state agency physicians not having reviewed or commented on Dr. Kaufman's opinion and Claimant did not, for example, request that those physicians be asked to review and possibly modify their opinions in light of Dr. Kaufman's opinion. (R. 89-90).

Finally, the ALJ also gave due consideration to other, non-medical evidence in the record and similarly concluded that this evidence contradicted the degree of impairment stated in Dr. Kaufman's opinions. Like the objective medical evidence, Claimant's activities of daily living belied the more extreme workplace limitations Dr. Kaufman opined were necessary. As part of his everyday routine, Claimant spent much of his time at home watching TV but would go out to lunch with either his cousin or a friend in Schaumburg almost every day of the week. (R. 52, 109). He was able to do his own grocery or other shopping as necessary, (R. 52), and when he goes shopping, including at Costco or the mall, he "walk[s] around the mall" as his "way of exercising, by walking as long as I can and stopping and sitting quite a bit, too." (R. 97). He cooked his own meals, did the cleaning around his house, was able to bathe and dress himself, did the dishes and the laundry, and would occasionally go out to dinner with friends or to the movies. (R. 109-110). Despite his limitations, Claimant was also able to travel internationally to Jamaica in 2013, (R. 100), and, in

2015, he attended two rock concerts at Soldier Field. (R. 98-99). Although a person's ability to do the things Claimant reported being able to do does not necessarily translate, by itself, into the ability to work on a full time basis, the ALJ was not wrong to consider Claimant's activities of daily living along with other evidence that contradicted the severe limitations recommended by Dr. Kaufman in determining what weight to accord Dr. Kaufman's opinion – in particular with respect to Claimant's ambulatory restrictions. *Zoch v. Saul*, 2020 WL 6883424, *3-4 (7th Cir. 2020).

In sum, the ALJ followed the two-step process required of her and supported her conclusions with substantial evidence in the record. She is thus entitled to deference in her determination. *Luster v. Astrue,* 358 F. App'x 738, 740 (7th Cir. 2010) (a court should uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment."). Importantly, the issue here is not whether the Court would have come to the same conclusion as the ALJ on the evidence before her. Rather, the inquiry is limited to whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527 and built an "accurate and logical bridge" between the evidence and her conclusion. *See Elder,* 529 F.3d at 415-16 (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527). The ALJ did enough under that deferential standard, and the Court has no grounds to disturb her conclusion as to the weight to be given Dr. Kaufman's opinion.

## II. The ALJ's Assessment of the Subjective Evidence and Testimony in the Record was not Patently Wrong

Next, Claimant asserts that the ALJ erred when she discounted Claimant's own subjective symptom testimony, as well as the statement provided by his daughter, when assessing his limitations. Claimant takes further issue with the ALJ's failure to expressly mention in her decision his cousin's testimony, which occurred at Claimant's original hearing before a different ALJ in

2015. Yet the ALJ provided a reasonable, fulsome discussion of whether Claimant's subjective symptom statements could reasonably be accepted as consistent with the objective medical evidence and other evidence of record under 20 C.F.R. § 416.929(a), and her assessment was not patently wrong. The ALJ's assessment of Claimant's daughter's testimony was similarly supported by the record and explained to the Court's satisfaction. Finally, the ALJ's failure to mention Claimant's cousin's testimony, which was duplicative of other evidence in the record, was harmless.

### A. Claimant's Subjective Symptom Allegations

The Court first turns to the ALJ's evaluation of Claimant's subjective symptom statements, which will be upheld unless it is "patently wrong." *Burmester v. Berryhill,* 920 F.3d 507, 510 (7th Cir. 2019); *Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "SSR 96–7p provides a two-step test for adjudicators to follow when evaluating a claimant's symptoms such as pain." *Maske v. Astrue*, 2012 WL 1988442, at *11 (N.D. Ill. 2010). First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96–7p., 61 Fed. Reg. at 34484. Second, if there is such an impairment, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id*. at 34485. The ALJ must justify his or her subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and in doing so, must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms,

aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, *7-8 (Oct. 25, 2017).

The ALJ was not patently wrong in her assessment of Claimant's subjective symptom statements here, in that she provided several specific reasons supported by the record for not fully crediting Claimant's testimony. First, the objective medical evidence and Claimant's daily activities did not corroborate his subjective symptom statements. SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms."); *Jeske v. Saul*, 2020 WL 1608847, at *8 (7th Cir. 2020) ("agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities."). Claimant testified on the one hand, for example, that he had sharp, stabbing pains in both feet that "comes and goes," that this pain was brought on by standing and walking, that it severely limited his ability to work, but also that whether he is walking or standing, "the numb, the pain, the needles, the pins, everything starts coming" after "15/20 minutes." (R. 56, 104-105). Yet, as the ALJ discussed in detail, the objective medical evidence, as well as Claimant's routine and conservative courses of treatment and his own prior statements in the record, showed that the severity of symptoms he alleged were something less than he reported during the hearing before the ALJ.

For example, although Claimant sometimes complained of foot numbness, tingling, or pain during the relevant period,[8] the ALJ correctly noted that Claimant's physical examinations were

---

[8] In support of his argument, Claimant cites to over a dozen different places in the record where he allegedly complained of pain with prolonged standing and walking. [ECF No. 15] at 19 (citing R. 57, 106, 108, 118, 598, 601, 604, 656-57, 704, 720, 887, 944, 950, 956, 996, 1003, 1016, 1024, 1038, 1074, 1103, 1112, 1137, 1219, 1229-230, 1240, 1244, 1252, 1263). In the Court's review, few, if any, of these record cites provide information relevant to the Court's analysis on this point. Most of them simply cite to a list of Claimant's prescriptions or a summary of his past medical history and otherwise do not contain any allegations of pain contemporaneous with a medical visit. See, e.g., (R. 598, 704, 720, 887, 944, 950, 996, 1003, 1038, 1074, 1103, 1112, 1219, 1252, 1263). On at least one occasion, the record cite provided shows Claimant in fact

18

"within normal limits, except for rare acute issues." (R. 21). And while Claimant complained of pain in his feet at some of his medical visits, those complaints were inconsistent and usually were mild in nature with no major limitations reported in activities of daily living. *See, e.g.,* (R. 654) (01/19/2012: "patient started working was on his feet for 8 to 12 hours a day for 6 months patient was fired on Dec 30th and has not done this since then. Leg pain gone but feet pain remaine [sic] with sharpe [sic] pains in toes and bottom of feet on and off esp[ecially] in the am when he fisrt [sic] gets up."); (R. 737) (08/24/2012: "Cardiovascular: Negative for chest pain and leg swelling. **Walks regularly**[9]…Musculoskeletal: negative for myalgias, back pain and joint pain. **Feet hurt in morning**…Neurological: Positive for tingling (feet)."); (R. 729) (11/26/2012: "MUSCULO-SKELETAL: No complaints of muscles, bones, or joints…CNS: No problems with coordination, balance, vision, strength, + numbness and tingling both feet and right thumb…"); (R. 719) (01/21/2013: "[Claimant] notes neuropathy that limits his ability to walk. He generally feels well otherwise."); (R. 701-710) (07/29/2013: no complaints of foot or leg pain); (R. 711-717) (02/26/2013: no complaints of foot or leg pain); (R. 885) (02/05/2014: no complaints of foot or leg pain); (R. 956, 959-60) (04/23/14: "**Pain Information (Last Filed),** Score: 0," "Claimant referred to outpatient podiatry, "Musculoskeletal: negative for myalgias, back pain and joint pain. Bilateral foot pain for 6-7 months. Stabbing, on/off."); (R. 1016) (05/12/2014: "Feet OK still hurt with walking and at times with sitting."); (R. 998) (08/27/2014: "**MUSCULO-SKELETAL:** No complaints of muscles, bones, or joints…**CNS:** No problems with coordination, balance, vision, strength, numbness, or tingling…**NEUROLOGIC:** Mental status normal. Gait normal. Muscle strength 5/5 throughout. Sensation grossly intact.").

---

rated his pain as a "0" on the date in question. (R. 956) ("**Pain Information (Last Filed)**, Score: 0") (emphasis in original).

[9] All emphasis is original in Claimant's medical records.

As for Claimant's daily activities, the ALJ noted that Claimant's subjective complaints were also not consistent with his documented activities of daily living and in fact "suggest that he is much more functional than he has tried to portray in this claim." (R. 23). As described above in Section I, Claimant lived with his daughter for a period of time, but otherwise lived by himself and was self-sufficient in that regard. (R. 92). During the week, he spent most of his time at home watching TV but would regularly meet a friend or his cousin for lunch. (R. 52, 109). He was able to do his own grocery or other shopping as necessary, (R. 52), and often walked around the mall or Costco for exercise. (R. 97). He cooked his own meals, cleaned the house, including doing the dishes and the laundry, bathed and dressed himself, and would sometimes go out to dinner or to the movies with friends and family. (R. 109-110). Claimant went on vacation to Jamaica in 2013, (R. 100), and, in 2015, he attended two rock concerts that involved climbing some number of stairs at Soldier Field, though the number of stairs is in dispute.[10] (R. 23, 98-99). He had a passion for music and attended other concerts between 2011 and 2015 in addition to the two concerts at Soldier Field mentioned earlier. (R. 111). Claimant also testified at the hearing that he was planning to install a treadmill in his home as soon as he determined how much room he would have in the room in which that equipment would be installed. (R. 23, 98).

None of this, of course, establishes conclusively that Claimant was capable of full-time work, but the ALJ did not equate Claimant's activities of daily living with full-time work. Instead,

---

[10] Claimant disputes the significance of some of this evidence and faults the ALJ for taking it into consideration. For example, Claimant says he "laid on the beach for the entire four days of the trip [to Jamaica]." [ECF No. 15] at 15. But the ALJ may have focused more on Claimant's travel to and from Jamaica, just as she focused on how Claimant got to and from his seat at concerts held at Soldier Field, rather than on the vacation or at the concerts themselves. (R. 23). According to treatment notes from July of 2015, Claimant attended "Grateful Dead & Rolling Stones concerts in the past 2 weeks, at Grateful Dead in Soldier Field climbed 18 flights of 20-step stairs only stopping once, but 'it took 15 minutes to recover.'" (R. 1208). Claimant testified at the hearing that this was not accurate, and that he climbed up only 18 rows to get to his seat. (R. 98). He also said that he "pushed [himself] a little bit too far on that one," (R. 99), which the ALJ acknowledged. (R. 23).

she considered Claimant's activities and reasonably concluded that they undercut the credibility of Claimant's subjective symptom statements concerning the intensity, persistence, or limiting effects of his symptoms, and this was not improper. *Burmester*, 920 F.3d at 510 ("The ALJ did not equate Burmester's ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules.").

As the Seventh Circuit has recognized, "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *see also, Britt v. Berryhill,* 889 F.3d 422, 426 (7th Cir. 2018); *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir.2005); *Mueller v. Astrue,* 860 F. Supp. 2d 615, 633 (N.D. Ill. 2012). In this case, Claimant testified at times during the hearing before the ALJ that he was more limited in his activity during the relevant time period than even Dr. Kaufman found him to be. See (R. 56) ("…15/20 minutes and the numb, the pain, the needles, the pins, everything starts coming"); (R. 105) ("…if I would be standing for any amount of time my feet would just start screaming and hurting"); (R. 107) (only can walk ten to fifteen minutes at any one time); R. 108 (can stand only for five to ten minutes). In addition, Claimant's testimony and reports to medical professionals during the relevant time period often was inconsistent with respect to how he felt and what he could do. See (R. 23-24);  (R. 96) (Claimant said he most likely would have continued working as an appliance salesman had he not been terminated from his last job); (R. 108) (Claimant testified he stood for three to four to five hours at a time at his last job as an appliance salesman but would take forty-five minute bathroom breaks to rest); (R. 445) (In his work history report dated December 21, 2013, Claimant reported

that when he worked as an electronics and appliance salesman, he would walk or stand for eight hours a day, and sit for two hours a day, five days a week); (R. 653-54) (Claimant told Dr. Kaufman's nurse practitioner on January 19, 2012 that he "was on his feet for 8 to 12 hours a day for 6 months" at his last job before he was fired); (R. 55, 737, 1139) (Claimant walks regularly, and can walk six to eight blocks at a time for approximately thirty minutes). Thus, there is substantial evidence in the record to support the ALJ's conclusion that Claimant was not as disabled during the relevant time period as he portrayed himself to be. At the very least, there was evidence in the record from which the ALJ reasonably could infer that Claimant was not telling her the truth about his level of pain and his functional capacity during the relevant time period.

It is important to recognize, as Magistrate Judge Cole did recently in a similar context, that, unlike this Court, the ALJ "had the opportunity to observe the claimant testifying, and, as Justice Jackson rightly observed more than a half-century ago, 'a few minutes observation... in the courtroom is more informing than reams of cold record.'" *Brenda L. v. Saul,* 392 F. Supp. 3d 858, 864 (N.D. Ill. 2019) (quoting *Ashcraft v. State of Tenn.,* 322 U.S. 143, 171 (1944) (Jackson, J., dissenting)). The ALJ is ultimately responsible for explaining her subjective symptom evaluation "in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted). The ALJ did so here by providing detailed reasons for her credibility finding that were supported by the record as a whole. Because the ALJ's credibility determination that Claimant's subjective symptom statements were inconsistent with the medical evidence, his doctors's opinions, and his daily activities did not lack "any explanation or support" and was not "patently wrong," the Court will not overturn it. *Elder*, 529 F.3d at 413-14.

**B.      The Lay-Opinion Testimony of Claimant's Daughter and Cousin**

As to the statement provided by Claimant's daughter, Stacy Phillips, Claimant argues that the ALJ erred irretrievably in assigning it little weight. In evaluating a claimant' credibility and weighing other evidence in the record, the ALJ must consider statements from lay witnesses. 20 C.F.R. § 416.945(a)(3) ("We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons."). The ALJ, though, is not required to incorporate these statements into the RFC and may discount the testimony if they find that it conflicts with the medical evidence or otherwise lacks credibility. *Cirelli v. Astrue,* 751 F.Supp.2d 991, 1008-09 (N.D. Ill. 2010); *see also, Behymer v. Apfel,* 45 F.Supp.2d 654, 663–64 (N.D. Ind. 1999) ("When an ALJ fails to believe lay testimony about a claimant's allegations of pain or other symptoms, he should discuss the testimony specifically and make explicit credibility determinations.") (citing *Smith v. Heckler,* 735 F.2d 312, 313 (8th Cir. 1984)).

Claimant argues that his daughter provided evidence that "her father could not stand or walk for long periods of time, did not go out to concerts as often as he used to because standing was painful, and described the difficulty Mr. Phillips had in attending the concert at Soldier Field." [ECF No. 15] at 19-20 (citing R. 452-58, 528). In evaluating Claimant's credibility, as well as other evidence in the record, the ALJ weighed the impact of Ms. Phillips's statement and determined that it was entitled to little weight. Contrary to Claimant's argument, the ALJ provided specific reasons for doing so that were supported by the record. (R. 25).

The ALJ chose to afford little weight to Ms. Phillips's statement because she is not a medically trained source, was not a disinterested third-party witness, and "most importantly," Ms. Phillips's opinion was not consistent with "the preponderance of the opinions and observations by

medical doctors in this case." (R. 25). For example, Ms. Phillips's proffered testimony that Claimant was attending fewer rock concerts than he had in the past because standing for long periods of time is painful for him does not undercut the ALJ's finding that Claimant's ability to attend such concerts, including concerts at Soldier Field that required a substantial amount of walking and stair climbing, was inconsistent with his subjective statements concerning the severity of the pain he experienced and when it occurs. The issue in this case is not whether Claimant experienced pain in his feet but whether that pain was as disabling as Claimant claimed it was. Claimant's daughter may have supported her father's claimed limitations, but the ALJ's conclusion that Ms. Phillips's testimony should be given little weight on this question was not "patently wrong" under the circumstances and will not be disturbed by this Court.[11]

Similarly, although the ALJ failed to expressly mention the prior testimony of Claimant's cousin, James Kissel, during an earlier hearing in Claimant's case before a different administrative law judge, any error in doing so was harmless. The Seventh Circuit has "repeatedly stated that the ALJ need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985); *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984)). Instead, the ALJ must only articulate her assessment of the evidence to enough of a degree to assure this Court that the ALJ "considered the important evidence…[and to enable] us to trace the path of the ALJ's reasoning." *Stephens*, 766 F.2d at 287. The ALJ did so here, and any omission of Mr. Kissel's testimony was harmless.

---

[11] The Court notes, though only parenthetically because this was not something the ALJ said or specifically relied upon, that Ms. Phillips reported her father "never had problems walking or standing" when he worked as an appliance salesman, (R. 453), even though, at times, Claimant testified differently on that point, as did Claimant's cousin.

As the Commissioner correctly points out, Mr. Kissel's testimony was, in large part, duplicative of other evidence in the record reviewed by the ALJ, including Claimant's medical records and his own testimony, and the statement provided by Claimant's daughter. Mr. Kissel testified that Claimant would tire easily when walking, that Claimant told him that he had trouble standing and walking for an eight-hour workday, and that Claimant reported pain in his feet. (R. 63-65). Much of what Mr. Kissel testified about was based on what Claimant told him and served to corroborate at least some of Claimant's testimony. But to the extent the ALJ did not completely credit what Claimant said, it is not likely she placed (or would have placed) much weight on Mr. Kissel's testimony, just as she discounted Claimant's daughter's statement as a close relative of Claimant and a non-medical source. As such, Mr. Kissel's earlier testimony was not a separate line of evidence that the ALJ can be faulted for not expressly recognizing. (R. 20); *see Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) ("Books's brother Roland's testimony did not constitute a separate 'line of evidence.' Rather, it served strictly to reiterate, and thereby corroborate, Books's own testimony concerning his activities and limitations. To the extent ALJ Bartelt found Books's testimony concerning his disabling pain and physical limitations to be untenable when contrasted with his reported daily activities and the relevant medical evidence, he necessarily found Roland Books's supporting testimony similarly not credible. ALJ Bartelt, therefore, did not err by declining to address Roland's testimony specifically."). Therefore, it was not reversible error for the ALJ not to specifically discuss Mr. Kissel's prior testimony in her opinion.

### III.    The RFC was Supported by Substantial Evidence and the ALJ Properly Considered Claimant's Limitations, Both Individually and in Combination

Finally, Claimant argues that the ALJ failed to support the RFC with substantial evidence. In support of this conclusion, Claimant asserts that the ALJ improperly calculated the amount of time Claimant would be able to sit, stand, and walk during the workday and that she also failed to

consider the effect of Claimant's limitations in combination. [ECF No. 15] at 9-13. Because the ALJ built a logical bridge from the medical and other evidence to her conclusions in the RFC, and because the RFC itself was supported by substantial evidence, this Court is unconvinced that the RFC did not adequately accommodate Claimant's limitations.

The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. 20 C.F.R. § 404.1545(a). It is "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," *Id.*, and must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt,* 758 F.3d at 857; *see also, Gloria A. v. Saul*, 2020 WL 6581649, at *7 (N.D. Ill. 2020). An "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton*, 596 F.3d at 425. However, it is also true that "an ALJ need not mention every piece of evidence, so long as [she] builds a logical bridge from the evidence to [her] conclusion." *Id.* (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)).

In formulating the RFC, the ALJ determined that Claimant was capable of performing light work provided he was not required to climb ladders, ropes and scaffolds, could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, and avoided concentrated exposure to unprotected heights, moving and hazardous machinery, and temperature extremes. (R. 19). As this Court discussed in Sections I and II of this Memorandum Opinion and Order, the ALJ conducted a thorough review of all the objective medical evidence, Claimant's subjective testimony, and his activities of daily living. After considering this evidence, together with other

non-medical evidence in the record, the ALJ concluded that Claimant's severe impairments – obesity, peripheral neuropathy, coronary artery disease, hypertension, and diabetes mellitus – did limit Claimant's ability to work, but not to the extreme degree propounded by Claimant and his treating physician, Dr. Kaufman.

The predominant theme of Claimant's arguments in this case is that the ALJ erred – whether in assessing Dr. Kaufman's opinion, the credibility of Claimant's testimony, or in formulating the RFC – in how she accommodated Claimant's foot pain and his ability to stand or walk, on and off, for approximately six out of the eight hours of the day as would be necessary in a light work setting.[12] The conclusion that he was capable of light work, Claimant argues repeatedly, is not consistent with the ALJ having found his peripheral neuropathy was a severe impairment. But again, as the Commissioner correctly notes, the question is not whether Claimant experienced peripheral neuropathy, but rather, the degree to which Claimant's neuropathy limited him. Simply because the ALJ identified neuropathy as a severe impairment does not establish that it functionally limited Claimant in significant ways, or to the degree Claimant would have this Court accept. *Collins v. Barnhart*, 114 F. App'x 229, 234 (7th Cir. 2004).

Here, the ALJ built a logical bridge to her conclusion that limiting Claimant to light work adequately accounted for Claimant's limitations. In 2011, Claimant reported that he worked as an

---

[12] Although the RFC does not explicitly state that Claimant must be able to stand or walk for up to six hours out of the day, the Social Security Administration defines "light work" as, in relevant part, a job that "requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position. "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Social Security Ruling 83–10; *see also,* 20 C.F.R. § 404.1567(b).

electronics and appliance salesman and was walking or standing for eight hours a day, five days a week. (R. 445). Claimant told a nurse practitioner in 2012 – shortly after he was fired from that position – that he was on his feet six to eight hours a day in that job. (R. 653-54). Claimant testified later that he actually only stood for "three to four to five hours at a time" because he took lengthy bathroom breaks and sat in the bathroom for forty-five minutes at a stretch, (R. 23, 108), but it was within the ALJ's purview to determine that Claimant's subjective testimony was not completely credible on this point in light of other evidence in the record. Claimant sustained this job for somewhere between four and six months until he was fired for nonperformance, (R. 440, 445, 654), but he previously had worked as an appliance salesman for a different employer for around ten years, so he knew what the job generally required. (R. 47-48). According to Claimant's own testimony, had he not been fired from his last job at the end of 2011 for performance issues, he would have continued working for that employer. (R. 94) ("Q: …What did they tell you was he reason they let you go? A: That things aren't working out for us, that's what they said. I believe the reason was I had a bad month and I didn't meet my numbers, but the only reason they gave me when they told me was things aren't working out for us. Q: So had they not terminated you, you would have continued there? A: Yes."); (R. 96) (Okay. So, again, had they not terminated you, would you have continued there? A: Most likely.").[13]

Claimant argues that his testimony that he would have continued working had he not been terminated was merely aspirational and taken out of context, but the ALJ was not unsupported by

---

[13] Claimant focuses on the reason he was fired – nonperformance or failure to meet sales numbers – and says this shows that he could not do the work because of his physical limitations. [ECF No. 15] at 10. But the record does not reveal whether Claimant's inability to meet sales quotas was due to his physical limitations. Instead, the ALJ focused more on Claimant's testimony that he would have continued working if he had not been terminated. (R. 23-24) ("…the claimant was terminated from both of his jobs as an appliance sales representative due to performance issues, not due to any physical limitations. Indeed, the claimant testified that he would have kept working in the job if he had not been let go.").

the record when she concluded that Claimant's statement was more consistent with the medical evidence and Claimant's activities of daily living than Claimant's subjective assertions of disability. During the relevant time period, Claimant traveled internationally, walked regularly, attended music concerts including at Soldier Field, and planned to begin walking on a treadmill. (R. 97-100). The ALJ also reviewed Claimant's medical records of his longitudinal care that revealed inconsistent complaints of pain during the relevant time period. (R. 654, 701-710, 711-717, 719, 729, 737, 885, 956, 959-60, 998, 1016). And, as noted above, the ALJ, importantly, had the opportunity to listen to and observe Claimant's testimony firsthand. *See generally, Zoch*, 2020 WL 6883424 at *3 ("We do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'"); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) ("The credibility determinations of an ALJ are entitled to special deference").

Ultimately, the ALJ, to some degree but not to the degree Claimant would like, did account for Claimant's ambulatory limitations in the RFC when she restricted him to light work. This restriction was consistent with the evaluations of the state agency physicians, the objective medical evidence, Claimant's activities of daily living, and Claimant's own testimony.

The ALJ also considered Claimant's impairments in combination, especially Claimant's obesity. She explicitly acknowledged that Claimant was morbidly obese and that "[o]besity is generally the result of a combination of factors, and the combined effects of obesity with other impairments may be greater than might be expected without obesity." (R. 22). She then went on to explain that in Claimant's particular case, there was "no documented evidence that [he] suffers any severe physical limitation due to his weight or that it restricts his ability to ambulate or perform other postural activities beyond the limitations accounted for in the residual functional capacity." (R. 22). Nor was the ALJ unsupported by the record in this respect; for example, Dr. Aliaga noted

in 2014 that Claimant's various diagnoses, which included obesity and peripheral neuropathy, did not limit Claimant's mobility in any demonstrable way. Claimant had no obvious difficulty during the examination with getting on and off the exam table, heel-walk, toe-walk or tandem gait, or squatting and arising. (R. 945). So too was weight bearing and single leg balance done bilaterally without difficulty. (R. 945).

Indeed, even Claimant does not argue in his brief that he has any limitations stemming from his obesity that would affect his ability to work. He makes only general assertions that the Social Security Administration recognizes that obesity can cause significant limits in standing and walking without applying this proposition to his particular impairments. [ECF No. 15] at 12 (citing SSR 02-1p, 2002 WL 34686281 at *6). And there appears to be no mention of obesity as a factor limiting Claimant's ability to work anywhere in the record, or at the very least, not that Claimant has identified to this Court. *See, e.g., Shumaker v. Colvin,* 632 F. App'x 861, 867-68 (7th Cir. 2015) ("Moreover, [the claimant] does not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments."); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (ALJ's failure to even mention obesity not enough to warrant remand where the claimant "does not explain how his obesity would have affected the ALJ's five-step analysis."). Ultimately, it is for the ALJ to weigh the evidence and to make judgments about which evidence is most persuasive. *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989). The ALJ did so here and explained her more than adequately explained her reasoning.

Finally, Claimant contends that the ALJ failed in the RFC to account for the work-related limitations of plaintiff's sleep apnea. Again, this Court is not convinced. The ALJ acknowledged the existence of Claimant's sleep apnea but said the record showed that it was controlled by CPAP

therapy, which it was. (R. 17-18). Claimant's complaints of daytime sleepiness were resolved by pressure adjustments to his CPAP, (R. 713, 715, 949), which Claimant himself acknowledged during the hearing. (R. 102) ("Q: So according to your pulmonologist, the CPAP or APAP, whichever one you're using, seems to resolve your excessive snoring and daytime sleepiness and those were notes that were indicated, you know, a few years ago. Do you agree with that? A: Yes. Q: Do you still use that? A: Oh, yes."). Given Claimant's reports of his daily activities, as well as corroborating notes in the medical records regarding the effect of Claimant's sleep apnea, the ALJ was entitled to conclude that Claimant's sleep apnea did not impose more than mild limitations on his ability to work.

At the end of the day, the ALJ concluded that, during the relevant time period, Claimant was able to do the work he had been doing as an appliance salesperson before he was fired from that job. That is consistent with Claimant's own testimony, the tone and overall substance of Claimant's medical records, particularly from physicians who treated and examined him, and Claimant's activities of daily living. The ALJ appears not to have believed Claimant when, for example, he testified that he could only walk for ten to fifteen to twenty minutes at any one time and could only stand for five to ten minutes. (R. 56, 107-08). The ALJ also appears not to have fully believed Dr. Kaufman's opinion that Claimant was capable of doing markedly less in a work setting, (R. 1137-40), than Claimant himself reported on several occasions that he was capable of doing during the relevant time period. (R. 96, 108, 445, 653-54). Based on a review of the entire record and the ALJ's decision in this case, the Court cannot say the ALJ's decision is not supported by substantial evidence.

The ALJ's decision may not be perfect, but it need not be. *Buchholtz v. Barnhart,* 98 F. App'x 540, 544 (7th Cir. 2004). As discussed above, the issue on appeal is not whether this Court

would have reached the same result as the ALJ on the record before her, but whether the ALJ was justified in reaching the decision she reached on that record. Here, the ALJ built an accurate and logical bridge between the evidence in the record, her conclusions, and the limitations contained in the RFC. She supported her conclusions with substantial evidence in the record. It is not this Court's role, nor is this Court inclined, to reweigh that evidence and overturn the ALJ's decision now for the reasons presented by Claimant on appeal. *Simila v. Astrue,* 573 F.3d 503, 513 (7th Cir. 2009) (a reviewing court should not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations.").

At the end of the day, even if the ALJ also could have reached a decision in Claimant's favor on the record before her, which is what Claimant contends she could and should have done, the ALJ's failure to do so is not reversible error as long as the decision the ALJ actually made is supported by substantial evidence in the record and the Court can follow the ALJ's rationale in concluding that Claimant is not disabled. *Brenda L.,* 392 F. Supp. 3d at 862 ("If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance.") (citing 42 U.S.C. § 405(g); *see also*, *Richardson,* 402 U.S. at 401; *Zoch*, 2020 WL 6883424 at *3 ("we ask whether the ALJ's decision is supported by substantial evidence – evidence that 'a reasonable mind might accept as adequate to support a conclusion.'"); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014)). The Court agrees with the Commissioner that the ALJ's decision in this case passes muster under the applicable legal standards.

**CONCLUSION**

For the reasons discussed above, Claimant's Motion for Summary Judgment [ECF No. 15] is denied, and the Commissioner's Motion [ECF No. 19] is granted.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge


Dated:    December 1, 2020